STATE ex rel. RESLEY and others vs. FARWELL, Gov., etc.

STATE ex rel. MARTIN vs. FARWELL, Gov., etc.

STATE ex rel. MARTIN vs. FARWELL, Gov., etc.

1. SUPREME COURT — JURISDICTION. — The power vested in the supreme court by sec. 3, art. VII of the constitution, "to issue writs of *habeas corpus, mandamus, injunction, quo warranto* and *certiorari,* was not conferred as an extension or enlargement of the original jurisdiction of the court, but merely to enable it to exercise the jurisdiction otherwise conferred on it, and as auxiliary thereto. It has no original

jurisdiction of such writs." LARRABEE, J., *dissenting. Contra, Attorney General v. Blossom.* 1 Wis., 317; *In re Booth,* 3 id., 49; *Attorney General v. Railroad Companies,* 35 id., 425.*

2. FOX & WISCONSIN RIVER IMPROVEMENT SCRIP — EXECUTIVE. — Although, under sec. 1, ch. 179, Laws 1851, a former governor had entered into a contract with the contractor on the Fox & Wisconsin River Improvement, and agreed to certify and authenticate the scrip authorized to be issued by the board of public works, under sec. 2, in payment of estimates, and to affix thereto the great seal of the state; yet, as there was no provision of law requiring him to do so, he was not, nor was his successor, under legal obligation, by reason of such contract or otherwise, to so certify and authenticate it.

3. SAME. — It seems that the state would not be liable on the scrip authorized to be issued by the board of public works under ch. 171, sec. 2, Laws of 1851, and that the issuing of such scrip is not forbidden by secs. 7 and 8, art. VIII of the constitution. But see opinion of HUBBELL, J.

4. SAME — STOCK CERTIFICATES — STATE DEBT. — Under secs. 5 and 6, ch. 340, laws of 1852, it was lawful for the secretary of state, under the direction of the governor, to issue stock certificates bearing interest, payable out of the moneys arising from the sale of lands granted in aid of the Fox & Wisconsin River Improvement, and pledging the revenues of said improvement, without any other pledge or liability therefor on the part of the state, for the redemption thereof; and to sell the said certificates or deliver the same in payment of any sums due or to become due to any contractor upon said improvement, as therein provided.

5. SAME. — The stock certificates, issued under secs. 5 and 6 of ch. 340, Laws 1852, do not, it seems, create an indebtedness against the state forbidden by the constitution. But see opinion of HUBBELL, J.

6. EXECUTIVE. — The question, whether the governor, in his person, is exempt from judicial control, and whether, and to what extent, his official action may be controlled or directed by the judicial power, discussed by HOWE, J.; holding that the executive, in his person, is subject to judicial control as other citizens, and that, in the exercise of his executive functions, he is entirely and absolutely independent of the judicial power, in so far as his official action involves the exercise of judgment or discretion.

(4 Chand., 104–106.)

* See also, *Attorney General v. Eau Claire,* January Term, 1875; *State ex rel. Attorney General et al. v. Baker,* August Term, 1875, in which the original jurisdiction of the court is further considered and expounded.

APPLICATIONS for writs of peremptory *mandamus* against *Leonard J. Farwell*, governor. The case, made by the relators *Resley, White & Arndt*, was, in substance, that by act of congress of August 8, 1846, there was granted to the state of Wisconsin, on its admission into the Union, for the purpose of improving the navigation of the Fox and Wisconsin rivers, and of constructing a canal to unite said rivers at or near the Portage, a quantity of land equal to one-half of three sections in width, on each side of the said Fox river and the lakes through which it passes, from its mouth to the point where the Portage canal shall enter the same, and on each side of the said canal, from one stream to the other, reserving the alternate sections to the United States, to be selected under the direction of the governor of said state, and such selection to be approved by the president of the United States. * * * That as soon as the territory of Wisconsin should be admitted as a state into the Union, all the lands so granted should become the property of said state for the uses and purposes contemplated in such act, *and no other:* provided, the legislature of the state should agree to accept such grant upon the terms specified in the act; and should have power to fix the price at which such lands should be sold, not less than one dollar and twenty-five cents the acre, and to adopt such kind and plan of improvement on said route as the said legislature should from time to time determine for the best interest of the state: provided, also, that the lands thereby granted should not be conveyed or disposed of by said state except as said improvement should progress — that is, the state might sell so much of said lands as would produce the sum of $20,000, and then the sales should cease until the governor should certify the fact to the president that one-half of that sum had been expended on said improvements, when the state might sell and dispose of a quantity of such lands sufficient to reimburse the amount expended, and thus the sales were to progress as the proceeds thereof should be expended; that the improvement should be com-

menced within three years after the admission of the state into the Union, and be completed within twenty years, or the United States should be entitled to receive the amount for which any of said lands had been sold by the state.

By the provisions of sec. 10, art. VI of the constitution of Wisconsin, it was declared that the state should " never contract any debt for works of internal improvements, or be a party in carrying on such works; but whenever grants of land or other property shall have been made to the state, especially dedicated by the grant to particular works of internal improvement, the state may carry on such particular works, and shall devote thereto the avails of such grants, *and may pledge or appropriate the earnings derived from such works in aid of their completion.*"

After the admission of Wisconsin into the union, its legislature by act (Laws 1848, p. 16) gave the assent of the state to the said act of congress of August 8, 1846.

The same legislature passed an act (Laws 1848, p. 58), entitled " an act to provide for the improvement of the Fox and Wisconsin rivers, and connecting the same by a canal," by which the construction of the improvements and the superintendence and repair thereof was placed under the direction and control of a " board of public works," who were authorized to appoint a superintendent and engineer. This act among other things provided that, after the construction of the canal between the two rivers, the net proceeds of one-sixth of the sale of the grant of land should be set apart for the improvement of the Wisconsin river, and five-sixths thereof to the improvement of the Fox river; that the works should be divided into sections, each of which should be let separately to the lowest bidder; that the aggregate amount of contracts at any time let by the board *should not exceed the available means* derivable from the sale of the lands granted in aid of such improvements, and that the governor should transmit monthly to the president of the United States a statement of the amount expended in the construction of such improvements during the

preceding month ; and also established a state land office for the sale of the lands under certain regulations therein prescribed, and the governor was invested with the general control and supervision of the whole work ; and it was made the duty of the superintendent to superintend the work of each contractor and to see that it was done according to contract, and once in each month to estimate the work done under each contract and to report the same to the secretary of the board who was to draw his warrant on the treasury of the board for seventy-five per cent. of the amount.

On the 11th of May, 1850, *Resley, White & Arndt*, relators in the cause first above entitled, entered into a contract with the board of public works to construct and finish the dam, lock and section of canal at Cedar Rapids on Fox river, and to do certain other work in and about the same, which the chief engineer having charge of the work should determine to be necessary, in order to complete it ; that it was agreed by said board that whenever funds should be realized from the sale of lands granted as aforesaid, monthly estimates should be paid to them equal to seventy-five per cent. of the value of the work done ; that on the 1st of November, 1851, a monthly estimate was made by the superintendent, and that the amount then due them, after deducting twenty-five per cent. and payments previously made, was $3,444.49, which amount was audited and allowed to them by said board of public works, and a proper certificate or voucher, as required by law, was given to them to that effect. By ch. 164, Laws of 1852, the treasurer of the state land office was authorized to pay interest at the rate of twelve per cent. per annum on all warrants issued in conformity to a resolution of the board of public works, adopted May 9, 1851. By another act of the legislature (Laws 1852, ch. 340), further provision was made for the sale of said lands, and it was provided that the moneys arising from such sales and payable into the state treasury (except so much as was required for certain specified sections of said work) should be set apart

as a separate and distinct fund for the purpose of paying interest on and redeeming the stock certificates provided for in the act (hereinbefore mentioned), and should be applied from time to time upon the warrant of the governor to the payment of interest on said certificates, and for their redemption when due and redeemable, and the said fund was to be and remain inviolably pledged and appropriated for such purposes, until such certificates were fully paid. This act further provided that " the secretary of state, under the direction of the governor shall cause stock certificates to be prepared of such denominations, payable at such place and at such limited periods, not exceeding ten years from the date thereof, as he may deem expedient, and bearing interest at the rate of twelve per cent. per annum, payable on the first day of January in each year, to be in the following or equivalent form :

" STATE OF WISCONSIN,<br>
" IMPROVEMENT FUND CERTIFICATE,<br>
" *State Department,*<br>
" Madison, ——, 18—.

" This certificate entitles —— or assigns to receive —— dollars on the —— day of ——, 18—, and interest thereon at the rate of twelve per cent. per annum on the 1st day of January in each year, until the time when the principal sum will be payable at ——; and for the redemption thereof and for the payment of interest thereon, the moneys arising from the sales of land granted by congress to the state of Wisconsin in aid of the improvement of the Fox and Wisconsin rivers and to connect the same by a canal in said state, and the revenues of said improvement are pledged and appropriated in and by an act of the legislature of said state, entitled " An act to provide for the completion of the improvement of the Fox and Wisconsin rivers," approved April ——, 1852, *without any other pledge or liability* on the part of the state.

" In testimony whereof, the secretary of state, in conformit

State ex rel. Resley and others vs. Farwell, Gov., etc.

with the provisions of said act has hereunto set his hand and affixed the great seal of the state.

[SEAL.]  "Done at Madison, this —— day of ——, 18—."

That such stock certificates should be signed by the secretary of state and countersigned by any transfer agent who might be appointed by the governor to negotiate the same, and the governor was by this act authorized to sell the said stock certificates or to deliver the same in payment of any sums due or to become due to any contractor upon said improvements, upon the proper voucher from the board of public works showing the amount so due; that no certificate should be disposed of at less than its par value, and the whole amount of such certificates to be issued under the act should not exceed the sum of $200,000; and in the application of the moneys to be received on sales of said certificates, preference should be given to contractors according to the date of their several contracts.

The relators averred that it became the duty of the governor to direct the secretary of state to cause stock certificates to be prepared in accordance with the provisions of this act, and to sell the same and to apply the proceeds to the payment of all sums due or to become due to contractors on said improvements according to the priority of their respective contracts, or to deliver the same at their par value in payment of any sum then due or to become due to them, upon proper vouchers of the board of public works showing the amount so due; that the relators, *Resley, White & Arndt*, had presented to *Gov. Farwell* their said certificate and voucher from the board of public works of the amount so due them, and demanded that he should pay them the amount thereof according to the provisions of said act, or that he should deliver to them stock certificates, as provided by the act, to the amount of said voucher so received from said board of public works; that the governor stated that he had no money for the purpose of paying the claim, and that he would not deliver any stock certificates to them in payment of the sum due them, nor for any sum due

or to become due to them under the contract; that the governor refused to direct the secretary of state to cause such stock certificates to be prepared as required by the act, and that he refused to sell such certificates for the purpose of raising money with which to pay the relators.

*Resley, White & Arndt* thereupon applied to the supreme court for a peremptory writ of mandamus to be issued, commanding the respondent, *Gov. Farwell*, to direct the secretary of state to cause stock certificates to be issued according to the provisions of said act; and that he sell the same and apply the money received therefor in payment of the sum due them, or that he deliver the same to them at their par value in payment thereof.

### MARTIN'S CASES.

The last two cases were applications for writs of peremptory *mandamus* against *Gov. Farwell* by *Morgan L. Martin*, both predicated upon the same indebtedness arising upon a contract entered into by Gov. Dewey with said *Martin*, under ch. 179, Laws 1851, by which the governor was authorized to accept a proposition made to him January 31, 1851, by said *Martin*, for completion of the improvement of Fox river between Green Bay and Lake Winnebago, and to enter into contract with the said *Martin* according to the terms and conditions thereof, provided he gave security, etc. This act provided that the work should be paid for upon monthly estimates made by the superintendent or engineer, in the same manner as the work under previous contracts had been estimated and paid for, if there should be funds in the hands of the treasurer applicable thereto, and if not, the board of public works should give him scrip signed by the president of said board and attested by their clerk, for the amount due on such estimates, which scrip was to constitute a debt against said improvement, for the payment of which and interest thereon at twelve per cent., payable annually, on the first day of January in each year, the said improvement should stand pledged, and the said board

should levy tolls upon all tonnage passing through or along the improvement, sufficient to pay the interest that might accrue and until the debt was paid; that on the 14th day of May, 1851, a contract was entered into between the said *Martin* on the one part, and the state of Wisconsin by the *Governor* of the other part, for doing said work according to said proposition. The provisions of the contract as to payment were, that estimates were to be made as provided for in the case of *Resley et al.*, and that it was "further agreed on the part of the state of Wisconsin, that monthly estimates will be paid to said contractor by the said board of public works equal in amount to seventy-five per cent. of the value of the work done, etc., and whenever funds shall be realized from the sales of land granted in aid of said improvement, the said monthly and final estimates shall be paid in coin, and in case there shall be no funds on hand applicable to that object, scrip shall be issued in conformity with the act authorizing the governor to accept the proposition of said *Martin*, which said scrip shall be payable in such amounts, and the interest thereon payable at such place, as the said contractor may desire."

＊　＊　"Said scrip shall be engraved with such devices thereon as may be deemed by the contracting parties necessary to prevent counterfeits, and shall be in the following or equivlent form:

"STATE OF WISCONSIN,
"*Office of the Board of Public Works,*
" No. —.　　　　　　　　　Oshkosh, ——, 185-.

" $——. It is hereby certified by the Board of Public Works of the State of Wisconsin that there is due to *Morgan L. Martin*, or order, —— dollars, under his contract with the state for the improvement of the Fox river, *payable out of the avails of the grant of land* in aid of the improvement of the Fox and Wisconsin rivers and the revenues thereof.

—— ——,
"*President of the Board of Public Works.*"
" Attest: —— ——, *Clerk.*'

"EXECUTIVE OFFICE, Madison, ——, 185–.

"I, —— ——, governor of the state of Wisconsin, do hereby certify that the foregoing scrip, for —— dollars, to *Morgan L. Martin*, is issued in conformity with an act of the legislature of said state, entitled "an act authorizing the governor to enter into contract with *Morgan L. Martin*, for the improvement of the Fox river between Lake Winnebago and Green Bay," approved March 11, 1851, and is payable out of the avails of the grant of land in aid of the improvement of the Fox and Wisconsin rivers and the revenues thereof, and is redeemable at the pleasure of the state; that the scrip bears interest at the rate of twelve per cent. per annum, payable annually on the first day of January, at ——, (deducting the current rate of exchange at Milwaukee), and that for the redemption of the said scrip and the payment of the interest to become due thereon, the improvement of the Fox and Wisconsin rivers, and the revenues to be derived therefrom, stand pledged by the state.

"In testimony whereof, I have hereunto set my hand and affixed the great seal of the state. Done at Madison, this —— day of ——, 185–.

"By the governor,

"*Secretary of State.*"

*Martin* gave the required security and entered upon the performance of his contract, and there became due to him on estimates of work performed, the sum of upwards of five thousand dollars. There were no funds in the hands of the treasurer applicable to the payment of this sum, and the Board of Public Works issued scrip to him in the form prescribed, to the amount of $5,000; which he presented to the respondent and demanded that it should be certified to and authenticated by him, as governor, and that the great seal of the state should be affixed thereto, in pursuance of said agreement; that the respondent refused to comply with this request, and he applied for a mandamus to compel Governor *Farwell* to cer-

tify to said scrip, and all scrip issued by the board of public works, pursuant to the said contract, and to affix the great seal of the state thereto.

The second application, on behalf of *Martin*, and the third case mentioned, was brought under ch. 340, Laws 1852, for a peremptory mandamus commanding the respondent to fully comply with and execute that act, by directing the secretary of state to cause *stock certificates* to be prepared in accordance with the terms of said act, and that he sell the same and from the moneys received therefor pay the said *Martin* the said sum of five thousand dollars due him as stated in his first application, or that he deliver said stock certificates at their par value to him in payment thereof. This application set forth in general terms the contract between said *Martin* and the state, but without any reference to the provisions therein for issuing scrip to him, and in substance made the same case as was presented by the application of *Resley et al., supra;* he, *Martin,* by his first application above stated, seeking to compel the mode of payment as specified in the act of 1851, ch. 179, and the contract between him and the state, and in the other, to obtain payment pursuant to the provisions of the act of 1852, ch. 340.

These several applications came before the court upon rules granted in vacation by the judge of the fourth circuit, requiring the respondent to show cause, etc., why the several peremptory writs so applied for should not issue.

In response to the rule in the case of *Resley et al.,* and the rule in the second case of *Martin,* to compel the issuing of *stock certificates* under ch. 340, Laws 1852, the respondent by protestation not submitting himself to the jurisdiction of the court, stated that all the acts and omissions complained of were done, committed or suffered by him in his official capacity as governor, and objected that the court had no jurisdiction by *mandamus* to enforce the performance of any of his executive duties ; that by the constitution and laws a circuit judge in vacation had no power or authority to award a rule to

show cause before the supreme court why a *mandamus* should not issue; that inasmuch as in the discharge of his official duties in relation to the matters mentioned in the applications certain questions of great importance to the state had arisen, depending upon the proper construction to be given to certain clauses of the constitution and the legislation in question, and being willing and desirous of being advised by the highest legal tribunal of the state, he respectfully submitted to the court for their opinion and advice by way of answer in the nature of a demurrer, for the purpose of obtaining that opinion; that the allegations of fact were true, except as afterwards traversed, but he denied that they were sufficient in law to authorize the issuing of a *mandamus;* that when he was applied to in the premises there was an outstanding indebtedness against the improvement fund (so called) of one hundred thousand dollars over and above the avails of the sales of the lands granted to aid it and all its revenue, bearing an interest of twelve per cent.; that the entire revenue from tolls in 1851 was only $70; that its revenues would for many years be insufficient to pay the interest; the land sales amounted to only about $1,000 per month, and a large proportion of the best lands had been already sold; that a large proportion of those remaining are unsalable; and that by no estimate of the annual sales to be made, would there be realized a sum of money which would not be very much exhausted in meeting the annual interest upon the existing indebtedness against the improvement fund; that as governor of the state it was not his duty, nor by the act of congress, the constitution and laws of the state, was he authorized to direct the secretary of state to cause stock certificates to be prepared and issued as required by the relators.

*First.* Because the said stock certificates would constitute a debt against the state, unauthorized by the constitution.

*Second.* To do so would be in contravention of the act of congress making the grant, and the constitution of the state, inas-

much as the certificates would constitute a funding system, which by anticipating the avails of the trust fund, would necessarily exhaust the same in the payment of interest.

*Third.* The said certificates are not to be issued for any debt authorized by the sixth and seventh sections of the eighth article of the constitution of the state.

*Fourth.* Because the provisions of the acts mentioned in the application have been substantially repealed or modified by a subsequent act. Ch. 464, Laws 1852.

*Fifth.* Because the acts required to be done, necessarily involve executive discretion, and therefore a *mandamus* cannot be granted.

The answer to the application of *Martin* for a *mandamus* to compel the respondent to sign and certify the scrip issued by the board of public works, and to affix the great seal of the state thereto, was in substance the same as to the other applications, and in relation to the scrip stated that it was headed :

"UNITED STATES OF AMERICA, STATE OF WISCONSIN — TWELVE PER CENT. STOCK," and was accompanied by coupons in the ordinary form, to be signed by him as governor of the state, and in form and to the effect following :

"STATE OF WISCONSIN — Pay to —— —— or bearer, the sum of —— dollars, being the interest to become due upon state scrip No. ——, on the —— day of ——, 18—.

—— ——,
" *Governor of Wisconsin.*"

Further, that it was not his duty to certify, authenticate, or issue such scrip as required by the said *Martin*, for the reason that the contract with said *Martin* and the said scrip would constitute a debt against the state unauthorized by the constitution, that such scrip purports to pledge not only the revenue of the improvement but the improvement itself, and not only on the lower Fox river, but the improvement of the Fox and Wisconsin rivers, and is not authorized by the constitution or the act of 1851;

that the act of 1851 neither makes it the duty of the governor to make any such certificate, or to contract to make any such scrip or certificate ; that the journals of both houses show that the act of 1851 was not passed by a vote of yeas and nays as required by the constitution.

It is to be regretted that the briefs of counsel cannot be found and hence it is impossible to present the points made or an abstract of the arguments.

*Geo. B. Smith* and *S. Crawford*, for relators.

*J. R. Doolittle*, for respondents.

It will be seen from the opinions which follow, that the court decided that it had not original jurisdiction of these applications, yet in response to the request of the respondent for an advisory opinion, the following statement of the opinion of the court on the merits, was prepared and filed by Chief Justice WHITON.

" 1. The court are of opinion that the governor is not required to authenticate the scrip issued under the act of 1851.

" 2. But the court see no valid legal objection to the issuing of the stock certificates as provided for in the fifth section of the act, entitled " an act to provide for the completion of the improvement of the Fox and Wisconsin rivers," passed on the 14th day of April, 1852, nor to the delivery of them in payment to contractors, as provided in the sixth section of said act."

Subsequently in the case of *State ex rel. Martin v. Farwell*, in relation to certification of the scrip issued by the board of public works under the act of 1851, the following opinion of the court was given :

HOWE, J.    On the 31st of January, 1851, the relator submitted to the legislature a proposition to do a certain work in the improvement of the Fox river, at prices therein specified, and upon certain terms of payment.

On the 4th of March following, the legislature passed an act authorizing the governor to accept said proposition, and to enter into a contract with the relator upon the terms thereof, and providing further that for work done under such contract, in case there should be a deficiency of funds to pay for the same, "the board of public works should give to said contractor scrip, signed by the president of said board and attested by their clerk, for the amount due" upon each monthly estimate.

Upon the 14th of May, 1851, the then governor of Wisconsin entered into contract with the relator, as authorized by said act, in which it was agreed, not only that in case of a deficiency of funds to pay any monthly estimate, the board of works should give to the contractor such scrip as was specified in the act, but that the governor should affix thereto a certificate, under the great seal of the state, and in a certain form prescribed in the contract.

The case shows that the respondent, the present governor, has refused to perform that part of the contract, and the relator prays that he may be compelled to do so by the mandate of this court.

This application must be denied for the following reasons :

1. Because, as we have already decided, in the case of the *State ex rel. Resley et al. v. Leonard J. Farwell*, the supreme court has not original jurisdiction of these causes ; and 2. Because, upon the case presented, we are all of opinion that the relator is not entitled to the relief he seeks.

Of the many objections urged against the claim of the relator, the court has considered only the following, which is considered conclusive upon the right asserted. The certificate which the relator demands either confers upon him some new right, not given by the scrip to which it is attached, or it does not. If it does confer a new right, we are all satisfied that the governor had no authority to contract for it, because the law under which he acted only provided for giving the scrip, without any

mention of the certificate. If it does not, this court will not command that to be done which confers no legal right.

When the relator obtained his scrip from the board of public works, he obtained all that the legislature authorized to be given him. And although the governor might, perhaps, add such a certificate as is now demanded with great propriety, yet he could not, by contract, bind his successors in office to do so.

LARRABEE, J., *dissenting.* I have no doubt that this court has original jurisdiction in this cause. I think it is conferred by the clear terms of the constitution, and we know it has again and again been exercised by this court, from its organization to the present time. I do not wish to argue this question; in fact it does not require any argument; but I wish to enter my dissent from the opinion of the majority upon this point.

And I also agree in the conclusion arrived at by the court in its advisory opinion, given by the governor's request; and I base my assent entirely upon the ground that, by the terms of the fund certificates themselves, there is no pledge or liability on the part of the state for their payment, except from the income of the improvement fund.

It is not my province to pass upon the *policy* of the law. That question belongs to a different department of the government. Whether this law contemplates a wise and prudent management of the trust delegated by the federal government is a question which belongs to the legislature. But I am entirely clear that there is no power conferred by the constitution to create a state debt for the prosecution of the Fox and Wisconsin river improvement. The whole genius of that instrument is in antagonism to such a construction; and I am quite sure its framers never contemplated such a result as that claimed by the counsel for the relator.

The state shall never contract any debt for works of internal improvement, or be a party in carrying on such works; but

whenever grants of land or other property shall have been made to the state, especially dedicated by the grant to particular works of internal improvement, the state may carry on such particular works, and shall devote thereto the avails of such grants, and may pledge or appropriate the revenues derived from such works to aid in their completion.

Here is the clear and explicit declaration that no debt shall ever be created for works of internal improvement. Nor shall the state be a party in carrying on such works save in certain cases. Now, what is the exception? Is it that no debt shall be created save in certain cases? or is it that the state shall not be a party, in connection with other parties, either in building works of internal improvement with its cash means or otherwise, or in any way be a party, save in the application of grants of land to the specified purposes of the grant? Why was it necessary to give the power to pledge the revenues of the work in aid of its completion, if the power already existed to create an unlimited state debt? Does the constitution say, first, that no debt shall be created for works of internal improvement, and then say that an unlimited debt may be created in certain cases? I have never so understood it, and I do not now so understand it; and, moreover, I think such a construction wholly unwarranted by any sound legal rules. The exception, in my opinion, to the constitutional prohibition, is not an exception to the prohibition of the creation of a debt, but an exception to the prohibition of being a party in any way, either with cash means or any other, to the carrying on works of internal improvement. Is it possible that the constitution can be so frittered away that upon the mere donation of a section of land to the state to aid in building a railroad, a debt of millions may be created for our citizens to pay? Yet to such a conclusion does the argument of the relator's counsel irresistibly bring us. If such is to be the construction of that instrument, the sooner we know it the better, for I am certain such was not the view of a single member of the convention

that framed the instrument, nor of a single man who voted for it.

The lessons of the past are unheeded by us, and the genius of our republican system is but an idle thing if we have not established that most important of all principles — the confining the powers of government within the strictest limits necessary to secure the enjoyment of life, liberty and property. I only regret that the opinion of the majority of the court presents an adjudication upon the all important questions presented in this cause. It is by far the most important cause that has come before this court. A cause involving principles that had better be settled at this time than delayed even for a single year.

The constitution further prohibits the state from creating any debt save for the purpose of defraying extraordinary expenditures, and this never to exceed the sum of one hundred thousand dollars. And the law which creates such a debt must also levy a tax to meet the interest and principal when due. In all these ways — profiting by the experience of the past — the framers of the constitution sought to avert the evils of debt. And yet, in spite of this, it is now seriously contended that but the slightest possible barrier exists to the creation of a state debt to an unlimited amount.

I think the constitution *first* absolutely prohibits the creation of a state debt for any work of internal improvement; and *second*, prohibits the state from being a party in carrying on such works, either directly through her public agents, or indirectly by being a stockholder in an incorporated company, except in cases where grants of land or other property may have been made, to be used in their construction. And that in such cases she must devote thereto the avails of such grants, and may pledge the revenues or tolls which are derived from completed portions, in aid of the completion of the whole; but that in no such case can she create a state debt. If she has present cash means, I am not sure the legislature might not

appropriate them in aid of the completion of such works; but I am sure any debt attempted to be created for such purpose would be in violation of the constitution.

But I forbear to discuss these questions at length, as no question is decided, save that this court has not original jurisdiction in cases similar to this.

In this opinion, with all due respect for the majority of the court, I cannot concur.

The case in which *Resley et al.* were relators, and the remaining one in which Martin was relator; to compel the issuing of stock certificates under the act of 1852, were disposed of by the following opinions:

Howe, J.    Under the act entitled "an act to provide for the improvement of the Fox and Wisconsin rivers, and connecting the same by a canal," approved August 8, 1848, the relators entered into contract with the board of public works for the erection of a dam, the construction of a lock and a section of canal, at Cedar Rapids, so called, on the Fox river, below the outlet of lake Winnebago.    In accordance with that contract they have done work to the amount of three thousand four hundred and forty-four dollars and forty-nine cents, for which they have not been paid by the state.

They aver that in May last their agent presented to the respondent, then and now the governor of this state, proper vouchers for such indebtedness, and demanded either the payment of the same in money, or that the governor should issue to them certificates for the amount under the provisions of the act passed at the last session of the legislature, entitled "an act to provide for the completion of the improvement of the Fox and Wisconsin rivers," and that the respondent refused to comply with such demand.    Such are substantially the allegations upon which the judge of the fourth circuit granted a rule

on the respondent, to show cause at the present term, why he should not be required by the mandate of this court to issue and deliver such certificate to the relator.

To this relation, his excellency, the governor, makes response, and although he denies the authority of this court to compel the performance of any part of his executive duties by mandamus, he yet admits the averments of the relators and submits several questions touching the propriety of the acts required to be performed by him, upon which he desires the opinion of this court.

In the judgment of a majority of the members of this court, this application, however well founded it may be in law, is nevertheless improperly addressed to the supreme court. These proceedings are in the nature of an action, to recover rights of which the relators seem to be deprived. They are instituted originally in this court.

The constitution of our state defines the jurisdiction of the supreme court in these words: "The supreme court, except in cases otherwise provided in this constitution, shall have appellate jurisdiction only, which shall be coextensive with the state; but in no case removed to the supreme court shall a trial by a jury be allowed. The supreme court shall have a general superintending control over all inferior courts; it shall have power to issue writs of *habeas corpus, mandamus*, injunction, *quo warranto, certiorari*, and other original and remedial writs, and to hear and determine the same." Now, it is evident this court has only appellate jurisdiction of this case, except it be a case "otherwise provided" in the constitution; and upon examination of that instrument, it does not appear to be otherwise provided, except it be included in the power to issue writs of *mandamus*. This leads us to inquire whether the power to issue the several writs above named, as well as other original writs, is conferred upon this court by way of extending its original jurisdiction, or to enable it to exercise the jurisdiction already conferred.

Most clearly, I think, the last must have been the real purpose of the grant, and for these among other reasons:

1. Because this court may find it necessary, either in the exercise of its appellate jurisdiction, or of its superintending control over inferior courts, to issue each one of the above named writs, and it was very proper, when the constitution had invested the supreme court with any jurisdiction whatever, to provide it also with the weapons by which that jurisdiction is usually enforced.

2. Because by the phraseology employed, this power does not seem to be cumulative. The terms are: " the supreme court shall have a general superintending control over all inferior courts; it shall have power to issue," etc. Had the convention intended this as a new and substantive grant of additional jurisdiction, I cannot think they would have failed to use the conjunction, *and,* or some other equivalent word to connect those two sentences.

3. Because the writ of *mandamus* is, strictly speaking, final process, and not mesne process; it issues to enforce a judgment, and not to authorize the rendition of judgment. It is styled by the English lawyers a prerogative writ. It issues from the sovereign power to some court or officer, commanding that to be done which the court from which it issued has determined ought to be done. Now it seems to me, the power to enforce a judgment by the writ of mandamus no more gives to this court jurisdiction of all causes, the judgment in which may be so enforced, than the power to issue a writ of *fieri facias*, which the supreme court undoubtedly possessed, gives to it original jurisdiction of all causes the judgment in which may be so enforced.

4. To put a different construction upon the last clause of the article I am considering, it seems to me would make it clearly repugnant to the first clause of the same article, or at least would destroy the whole force of that clause. The first clause reads as follows: The supreme court except, etc., " shall

have appellate jurisdiction only." The last clause declares that it shall have superintending control over inferior courts. It shall have power to issue writs of *habeas corpus*, etc., and other original and remedial writs. Now if this be a grant of original jurisdiction over all causes in which such writs may be employed, either as mesne or final process, then the whole article must be read like this: The supreme court shall have appellate jurisdiction only, except it shall have superintending control over all inferior courts; and also, it shall have original jurisdiction of all causes which may be commenced, or the judgments in which may be executed by writs of *habeas corpus*, *mandamus*, *injunction*, *quo warranto*, *certiorari*, or other original or remedial writs. If such be the extent of its *original* jurisdiction, it would be worth the study of the antiquary to deter·mine what are the cases in which it has *appellate* jurisdiction only.

Such cannot be the true interpretation of the article ; and if authority would be more conclusive than the reasons I have ventured to offer upon this point, it is not entirely wanting.

The constitution of the United States vests in the supreme court original jurisdiction in cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party. In all other cases coming within the judicial power of the United States, it declared the supreme court shall have appellate jurisdiction. Const. U. S., art. III, § 2.

Congress, at its first session after the adoption of the constitution, enacted a law, containing the following, among other provisions : " The supreme court shall also have appellate juris-diction from the circuit courts of the several states in the cases hereinafter specially provided for; and shall have power to issue writs of prohibition to the district courts, when proceeding as courts of admiralty· and maritime jurisdiction, and writs of *mandamus* in cases warranted by the principles and usages of law, to any courts appointed, or persons holding office under the authority of the United States."

In 1801, William Marbury applied to the supreme court for a *mandamus* to the secretary of state, to compel the issuing of a commission which had been made out to him as justice of the peace for the district of Columbia. The court held that such writ might be employed in the exercise of its appellate jurisdiction, and therefore congress could properly direct it to be issued to *courts*, but to issue it to an *officer*, as requested in that case, was the exercise of original jurisdiction ; that such jurisdiction was not conferred in that case by the constitution, and that congress could not confer it. *Marbury v. Madison*, 1 Cranch., 137. The analogy between that case and the case at bar may not be apparent at the first view. The constitution of the United States is silent as to the power of the supreme court to issue writs of *mandamus*. Congress undertook to, and in terms, did confer that power. The question, therefore, in that case was, could congress confer such a power? The court, in effect, said the original jurisdiction of the supreme court is confined to a few specified cases ; its appellate jurisdiction is general, extending to all other cases within the judicial power of the government. Congress may confer the power to issue this writ in the exercise of that appellate jurisdiction already conferred, but not as a new branch of original jurisdiction.

The constitution of this state does give the power to issue this writ. There is no doubt but the constitution could authorize the use of it generally by this court. The question to be considered here is therefore not what could they do, but what did they do. Did they confer the power to issue this writ, as a means of exercising the jurisdiction already conferred, simply, or as a new branch of original jurisdiction? What therefore congress could do, after the federal constitution had said the jurisdiction of the supreme court, *except in specified cases, shall be appellate*, that alone I think the constitution did do, or intended to do, after it had declared that the jurisdiction of the supreme court, *except in cases otherwise provided, shall be appellate only.* For it must be remembered that the power to issue each

one of the writs named in the last clause of that section of our constitution, which I am discussing, is necessary to a complete exercise of the jurisdiction therein before vested in the supreme court. The construction here contended for makes each clause of that section operative. ·The first clause defines the nature of the jurisdiction which the supreme court may wield, while the last clause supplies the machinery necessary to wield it. Any other construction, it seems to me, gives to the last clause the effect of utterly destroying the boundaries defined by the first clause.

I have dwelt thus long upon the point, not because it seemed to *me* of difficult or doubtful solution, but in deference to the opinion of those judges who felt compelled to differ from the majority of the court upon it. I regret that, in this judgment, which affects the constitutional powers of the highest court in the state, the whole court could not have concurred.

Because therefore this court has not, under the constitution of this state, original jurisdiction of the cause, the writ of mandamus asked for by the relators must be denied.

But since the questions raised by the answer of the respondent are of great public importance, and the opinion of the supreme court seems to be equally desirable to the parties, we have looked into the relation and the response, and have passed upon some of those questions.

The objections urged by the respondent against the claim of the relators are chiefly based upon the alleged invalidity of the act of our legislature (Laws of 1852, ch. 340), which provides for the issue of such stock certificates as are demanded by the relators.

The answer indeed, contains some statements, which seem rather to impugn the policy of that act, than to deny its validity. Those statements are, that when he refused to issue such certificates, there was already a large outstanding indebtedness against the improvement fund, that the tolls hitherto derived from the work have been quite inconsiderable, that the sales

of the improvement lands for the ten months ending January 2, 1852, amounted to less than $1,000 per month, that the out-outstanding liabilities amounted to less than $1,000 per month, that the outstanding liabilities are drawing a heavy rate of interest, " and that by no estimate of the annual sales, to be hereafter made, will be realized a sum of money which will not be very much exhausted, to meet the annual interest upon the indebtedness already existing against the improvement fund." These considerations would seem very proper to have been addressed to the legislature which passed the act. I have no means of knowing that they were not duly weighed by that body. If they were not so, I know of no authority in this court to decree the nullity of a legislative enactment because of its impolicy. The purpose of the act I am considering as declared by its title, is " to provide for the completion of the improvement of the Fox and Wisconsin rivers," and it is to be observed that the answer does not deny, but when that improvement shall be completed, the revenues to be fairly anticipated from the complete work, together with the avails of the lands granted to it and remaining yet to be sold, will realize a sum sufficient to liquidate all indebtedness already accrued and to accrue, together with all the interest that may accumulate thereon, thus doing full justice to the creditors of that fund, and leaving the ordinary revenues of the state, not only unembarrassed by any liability incurred on account of this work, but also unvexed by any claim or liability.

And surely it was a proper exercise of legislative discretion, and of legislative discretion only, to determine whether the early completion of the work was of sufficient importance to the state to warrant the payment of interest on such debt as might be incurred by anticipating the avails of the grant set apart for the work, unless such exercise of discretion be denied by the constitution of this state, or be in derogation of some trust imposed by the act of congress making such grant. To those instruments I apprehend we must look for any restric-

tions that may have been imposed upon the power of the legislature to direct the mode and the time of prosecuting this work. To those instruments in fact the respondent appeals for sanction of some of the positions he assumes. These positions are briefly as follows:

*First.* That the stock certificates demanded by the relators constitute a debt against the state of Wisconsin, unauthorized by the constitution.

*Second.* That they anticipate the avails of the trust fund, and will necessarily exhaust the same in the payment of interest, and therefore contravene both the constitution of this state, and the law of congress making the grant.

*Third.* That said certificates are not issued for any debt authorized by the 6th and 7th sections of the 8th article of the constitution of Wisconsin.

The truth of the last proposition is undeniable, and upon this branch of the case it is sufficient to say that if the authority of the legislature to pass the act of the 14th of April last depended upon these sections, it could not be maintained. But do the stock certificates authorized by the act last mentioned constitute a debt against the state of Wisconsin unauthorized by the constitution? Had the actual relations existing between the state and the relators, as well as the true character of those certificates been duly considered, I cannot think such a proposition would have been asserted. I will recur for a single moment to the history of this improvement, and the legislation in regard to it.

On the 8th day of August, 1846, the president of the United States approved an act of congress which granted to the state of Wisconsin, "on the admission of such state into the union, a quantity of lands for the purpose of improving the navigation of the Fox and Wisconsin rivers," which enacted further, that upon such admission, "all the lands granted by this act shall be and become the property of the said state for the purpose contemplated in this act and no other. Provided,

that the legislature of said state shall agree to accept said grant upon the terms specified in this act," and further, "that the said improvement shall be commenced within three years after the said state shall be admitted into the union, and completed within twenty years, or the United States shall be entitled to receive the amount for which any of said lands may have been sold by said state." In 1848 the state of Wisconsin was admitted into the union under a constitution which contains the following provisions: "The state shall never contract any debt for works of internal improvement, or be a party in carrying on such works; but whenever grants of land or other property shall have been made to the state, especially dedicated by the grant to particular works of internal improvement, the state may carry on such particular works, and shall devote thereto the avails of such grants, and may pledge or appropriate the revenues derived from such works in aid of their completion." Const. of Wis., art. VIII, sec. 10.

Now this improvement was a "particular work," to which a grant of land had been "especially dedicated," and of course was excepted from the operation of that clause which declared that "the state shall never contract any debt for works of internal improvement," or from that clause which declares that the state shall not be a party in carrying on such works; or from both those clauses. I understand the counsel for the respondent to have admitted upon the argument that it was excepted from the latter clause, but to deny that it was excepted from the former. And for the purpose of this case it is sufficient that the constitution clearly gives to the state authority to carry on this work.

The first legislature which assembled under this constitution accepted the grant, and this perfected the title of the state to the lands mentioned in it; and also proceeded to adopt a plan for carrying on the work. It was placed under the direction and control of a board of public works, and the board was

authorized, under certain restrictions, to put the work under contract by sections.

In accordance with that plan the board let the relators the contract under which they have earned the sum for which they now demand a certificate. The answer does not pretend that the legislature exceeded its constitutional powers in the passage of that act (Laws 1848, p. 58), or that the board in making the contract with the relators exceeded the power conferred upon them by the act. It is not denied but there are lands yet to be sold, and revenues yet to be derived from the work. The relators have not been paid, and there is no money under the control of the board to pay them. Now what do the relators demand? They ask that they may receive a certificate bearing the signature of the secretary of state and the great seal of the state, and containing the following acknowledgments:

1. That the holder is entitled to receive the sum herein before specified. 2. That he is entitled to receive annual interest on that sum at the rate of twelve per cent. per annum. 3. That that sum is payable at a certain time and place. 4. That for the redemption of the certificate, the moneys arising from the sales of land granted by congress to the state of Wisconsin in aid of the improvement of the Fox and Wisconsin rivers, and to connect the same by a canal in said state, and the revenues of said improvement are pledged and appropriated, in and by an act of the legislature of said state, entitled "an act to provide for the completion of the improvement of the Fox and Wisconsin rivers," approved April 14, 1852, without any other pledge or liability on the part of the state.

This is the whole extent of their demand, and I am wholly unable to perceive which one of those acknowledgments constitutes a debt against the state of Wisconsin unauthorized by its constitution. Whether the certificate be given or not, the

fact remains that the relators are entitled to receive the sum specified from *some* source. The certificate does not create that right, but is merely the evidence of it. The consideration for that acknowledgment the state has already received, in work done under a lawful contract. The constitution does not prohibit the secretary of state from attesting a fact so undeniable. The first clause of the certificate, therefore, does not conflict with the constitution.

The second clause relates to the payment of interest. It amounts simply to a declaration, that for giving day of payment on a sum due presently, the creditor is entitled to compensation in the way of interest. Such compensation is just. The law compels it from individual debtors, and I discover nothing in the constitution which prohibits the state from making the same compensation, provided the interest is charged upon the same fund which is liable for the principal.

What fund, therefore, is committed to the redemption of these certificates by their terms? Only the moneys to be derived from the grant, and the revenues to be derived from the work, " without any other pledge or liability on the part of the state." Those moneys the constitution declares shall be so appropriated, and those revenues it declares may be so appropriated.

When those means are exhausted by a faithful application of them to the redemption of these certificates, as provided by the act, there is an end of liability upon the certificates. If any further liability rests upon the state, it must result, not from anything in the certificates themselves, but from the original contract between the board of public works and the relators — a contract which we are neither asked to annul or enforce, and the validity of which I do not understand to be assailed. It is profitless to criticise the word " pledge," as used in the act of April 14, 1852, in order to ascertain its exact force and meaning, since it is the same word used in the constitution, and whatever it means in that instrument it

doubtless means in the act. But it is to be observed that this objection is urged against the application of parties who have already performed work upon the improvement under a contract with the agents of the state for carrying on that improvement. They have surely earned *some* rights under that contract, and what are they? It may be answered, the right to receive the money when it shall be realized from the fund applicable to that purpose. Now they ask for a certificate containing the acknowledgment of that very right, and they consent that it shall contain a clause excluding every other liability on the part of the state. I think it would be difficult to frame the acknowledgment of that right in terms more guarded than the very terms employed in the certificate prescribed by the legislature.

The legislature has directed such a certificate to issue, and the respondent says their act is not binding, because it has no authority to contract a debt against the state. But it will not do to issue the certificate, because, when issued, it will constitute a debt against the state. But, surely, the act of the secretary of state can be no more effectual to create a debt against the state, than the act of the legislature. Still it may be said, admitting the certificate does not effectually create a debt, but only purports to do so — admitting it is a nullity, equally with the law under which it is demanded — that, of itself, is a reason why this court should not command it to issue. It is very true, if the certificate be a nullity the relators can have no legal right to it; and courts employ the writ of *mandamus* only to enforce legal rights. But it would by no means follow, even if the certificate did attempt to charge the state unconstitutionally, that the certificate was null. It certainly does charge the improvement fund, and is so far a legal and valid instrument — is of value to the relators, and they ought to have it. Again, it is said that the certificate is assignable, and may be transferred to innocent purchasers. But I do not perceive how the capitalist, who may pay money for such a cer-

tificate, can be a more innocent or *bona fide* holder than the contractor, who has labored for it. Still, it is objected that the contractor takes it with notice, while his assignee might not. Notice of what? That the state is responsible for work done upon this improvement only to the extent of the fund set apart for it. I have not yet discovered that feature in any contract, or that provision in any law, which notifies contractors of that fact so distinctly as the certificate itself notifies all parties interested in it.

It is difficult to foresee, perhaps, what effect may be claimed for these certificates at some future time. But it is manifest that the relators claim them now, as evidence of their interest in the fund appropriated to the improvement of those rivers. To such evidence they are clearly entitled. They deny that the certificates have any other effect. And it seems to me the better time for the state to claim the protection of its constitutional safeguards against state indebtedness will be, when some party shall appear claiming to enforce any such indebtedness. But for this court to deny to the relators the evidence of a right which is theirs, from a jealous fear that it may hereafter be claimed as evidence of a right which is not theirs, would be as unreasonable as to withhold a judgment upon a promise clearly proved, from fear that the creditor might attempt to collect the judgment upon property which the law had exempted.

Another objection urged against the issue of these certificates is, that they constitute a funding system; that they anticipate the avails of the trust fund, and will necessarily exhaust it in the payment of interest, and that therefore they contravene both the constitution and the law of congress making the grant. I have already said that if the legislature has control of a fund with which to pay a specific claim, and they withhold the payment of it after it becomes due, I know of nothing in the constitution which prevents that body from compensating the creditor for such delay, by the payment of interest out of the same

fund. But whether the payment of interest will exhaust the fund must depend upon the rate of interest paid and the amount of revenue to be derived from the work. The rate of interest is high, and may be extravagant, but it is not within the control of this court. What revenue will be derived from the work when completed, the case does not inform us, and this court cannot judicially know. The legislature could only guess at it. If it should exceed the interest payable on the debt contracted for the completion of it, both the state and the fund will be profited by the arrangement. Otherwise it would seem to be injudicious.

But it was contended that congress had imposed some restraint upon the power of the legislature over this grant by the terms of the proviso to the second section of the act of August 8, 1846. Laws 1848, p. 58.

The proviso does impose some restrictions upon the sale of the land, but it opposed no obstructions to doing the work. It prohibits in terms the lands from being sold except as the improvements shall progress, and this congress might reasonably declare; but to declare that the work should only progress as the lands should be sold, and still to bind the state to complete the work in twenty years, as it does by the third section, would be unreasonable, and might defeat the very purpose of the grant, since the state might not be able to sell the land in twenty years. And if congress has not prohibited the work from being done in advance of the sales, a fortiori, it has not and could not prohibit the state from paying interest on such sums as might be earned, and the payment of which might be delayed.

But it is said further, that the stock certificate demanded by the relators will constitute an equitable mortgage upon the lands granted to the state, and will thus dispose of them in advance of the work. But a moment's examination will convince any one that neither the certificate nor the act under which it is called for, does pledge the lands, nor in any way incumber them;

but it only pledges the money to be derived from their sale, and the revenues to be derived from the work.

The only objection remaining to be noticed is, that the act of the 14th of April last (Laws 1852, ch. 340), is substantially repealed or modified by the act of the 19th of April following. Laws 1852, ch. 464.

I will not take time to discuss this objection. The last act purports to repeal nothing. The court has examined both acts. We find a wonderful harmony between some of their provisions, but no conflict between any of them, and we are therefore obliged to conclude that the latter act does not substantially repeal or modify the former.

I have thus examined all the points made upon the argument of the main question, to wit, whether the relators are entitled to such a certificate as they seek. And upon a careful consideration of them all, it is the opinion of the whole court that there exists no valid objection to the issue of such certificate·

Other questions were raised and argued in the progress of this cause, which the court did not decide, because they were not deemed material to the determination of this issue, and which, for that reason, I have not noticed.

I hope to be indulged, however, in making a few remarks upon one other point raised in this case, and which was not decided by the court. That point, as stated in the answer, is this: "That all of the said acts and omissions complained of by said relators were done, committed or suffered by him, the said *Leonard J. Farwell*, in his said official capacity as governor aforesaid, and not otherwise. And he therefore respectfully protests that this court has no authority or jurisdiction by *mandamus* to enforce the performance of any part of his executive duties." The position as I understand it, both from the answer and from the argument is this, that admitting the right in the relators as they assert it, and the duty upon the respondent as they charge it; yet, because the respondent is governor, neither the right nor the duty can be enforced in this court.

This proposition was asserted with much emphasis, and argued with great earnestness and force; but the strength of the argument, I am inclined to think, consisted mainly in a designed or accidental intermingling of two very different ideas; the one, that of the entire freedom of the person of the governor from judicial control, and the other, that of the absolute independence of the office of governor from the like control. These two ideas must be kept entirely distinct, or no discussion of the subject can be satisfactory or intelligible. The last idea is unquestionably correct. The office of governor is created by the constitution, and is one of three leading and coordinate agencies provided by that instrument, by which the frame work of society is to be maintained and the government of the state is to be administered. No lawyer will assert that, as such, it is in any way inferior to either of the other principal agencies.

But the duties and powers with which the executive is invested under the constitution are specified and limited. They are political, are derived directly from the constitution, and for the most part have relation, not to individual rights, but to the welfare of the state. However injudicious or mistaken he may be in the exercise of such powers or in the discharge of such duties, he is amenable only in the mode pointed out by the law which created the office and defined its powers and duties. For official error, he may be reproved at the time of final review by the people, and for official corruption, he may be reproved by a political tribunal constituted expressly to try him therefor. Thus, as I conceive, is the entire independence of the office and of the officer, while acting within its scope, fully conceded and amply secured.

No court will assume to tell him how to employ the military or naval force of the state, nor where or when to convene the legislature, nor what to communicate thereto, nor how to transact his business with other officers of the state, nor in what manner to execute its laws, nor whom to pardon, nor what bills to veto. These are duties which the law creating them has

confided to the discretion of the executive organ of the state. But, while this construction secures the independence of the executive office, it does not necessarily secure the inviolability of the person of the executive. It suggests, rather, the important inquiry, what becomes of the citizen when the governor is installed? As a citizen, he has assumed duties and contracted obligations to his fellow citizens, and what becomes of these? Are they merged in the higher duties and obligations which his office imposes? Is the citizen swallowed up in the officer? Unless it be so, I think there can be no pretense for asserting the inviolability of his person; and that all his private duties are not merged in his public duties, is apparent from the constitution itself. He at least may be made liable criminally, as a citizen. If he commits a crime, he can be indicted, tried and punished according to law, and also be impeached, according to the constitution. Const., art. VII, sec. 1.

But, prior to his election, he might have been a banker, or a merchant, or a lawyer, and, as such, have contracted liabilities, and what becomes of these? Does the state, when it makes him the executive of its laws, remit the debts he may owe to its citizens, as a testator forgives his debtor by making him the executor of his will? After his election, also, he may undoubtedly continue the same occupations and incur new obligations. Is there no remedy by which such obligations can be enforced? or is all remedy suspended until the state shall see fit to discharge him from its service? Or is some peculiar remedy afforded in respect to him, different from what is given against other individuals? Before I could consent to either of these propositions, I should desire to see it directly asserted by some positive provision of law, or at least necessarily implied from some such. I find no such proposition directly asserted, either in the constitution or laws of this state, and I confess my inability to discover from what provision of either, any such proposition is necessarily implied.

Justice STORY has indeed asserted that there are " incidental

powers belonging to the national executive which are necessarily implied, from the nature of the functions which are confided to it. Among these must necessarily be included the power to perform them, without any instructions or impediment whatsoever. He concluded, therefore, that the president cannot be liable to arrest, imprisonment or detention, while he is in the discharge of the duties of his office. And for this purpose, his person must be deemed, *in civil cases at least,* to possess an official inviolability." There have been few lawyers whose opinions upon a question of constitutional law are entitled to greater weight than those of that eminent jurist. But it is fair to be observed that he was not speaking judicially, and upon an argument of the point, but simply as a commentator upon the constitution. He cites no authority in support of the position. And, moreover, he was speaking of the president of the United States, an officer manifestly of higher dignity and more extensive power, than are possessed by the governor of this state. And, I desire to add, though with the greatest diffidence, that the position seems to me to have been advanced not upon the fullest reflection. For if the official services of the president are of such transcendent importance to the nation, I do not perceive why they should be arrested by criminal more than by civil process. The one issues to enforce public rights and the other to enforce private rights. If private justice must wait upon the discharge of his official duties, why should not public justice equally wait, especially since the public are more directly interested in these services, which are the considerations for foregoing either. The public welfare, when actually involved, will justify the extremest sacrifices of individual interests — even the sacrifice of life. But if the welfare of the state will justify taking the life of A. when he commits murder, will not the same consideration warrant the remission to B. of his life, when he shall commit murder, being president? Or is this the theory of government, that the welfare of the nation will be much promoted by the services of the president, but more by

his death, when he shall commit a crime involving that penalty? And is he hanged simply to satisfy a balance of interest? The services of the president are doubtless of vital importance to the nation, but it seems to me not to be vitally important that those services should be rendered by any particular individual. And those services do not terminate upon the death or removal of the individual who at any particular time may be called to render them, as has been twice demonstrated already in the brief history of our republic. Under the constitution, I think, they never terminate. In a somewhat restricted sense, I think we say of our president what England says of her king, that he never dies.

The hardship of declaring to a community, "you have dealt with A. as your equal, and he was such; you bought of him and sold to him, knowing that in all forms and by all penalties, just as your contracts could be enforced, his could be likewise; but now the state has called him into its service, henceforth, if you owe him anything, you must pay him, or you will be impleaded in the courts; but if he owes you, defer your claim until the state shall have discharged him from its service," is no imaginary or light hardship. In possible cases it might be very severe. No considerations of temporary convenience, or of seeming necessity could to my mind justify such a law. But it may be said, you may enforce the contracts of the governor, still you cannot arrest his person upon contract. Very true, but that happens not because he is governor of Wisconsin, but because he is a citizen of Wisconsin, whose constitution forbids his arrest. And if it be admitted that upon his promise to pay a hundred dollars, you may charge the executive in assumpsit according to the ordinary forms of law, it will not be denied, I take it, but in a proper case he may be charged in trespass, according to the forms which govern that action. The process of courts in our country is not graduated according to the rank of suitors in them.

But what necessity exists for exempting him from arrest

State ex rel. Resley and others vs. Farwell, Gov., etc.

who wields executive power, rather than him who wields judicial power? · In the latter case, indeed, the exemption exists, but it does not rest upon implication; on the contrary, it is expressly declared in the constitution. Executive power is no more important, as I conceive, than judicial or legislative power — all are essentials of a complete state. It may be asked, if the governor be arrested at the suit of an individual, who will discharge his official duties? To this I answer, that I am not aware but he could discharge those duties even under arrest or in confinement. They are not necessarily to be discharged at any particular place. I believe he is clothed with full executive power wherever he may be in the state. On the other hand, it may be asked with equal propriety, if the circuit judge be arrested, who will perform his duties? His functions can only be performed at the places assigned by law, and if he be constrained from going to those places, that arm of the judicial power is prostrated in his circuit. What if all the judges of the supreme court be placed under arrest at the same time? Justice is silenced in its highest tribunal. What if the secretary of state be arrested? Who will perform the manifold duties of his office, both as secretary and auditor? To descend still lower, what if a collector of taxes be arrested, who will collect the revenues of the state within his municipality? Yet, I think, no one will deny but each one of these officers is amenable to process, from the humblest judicial tribunal under the constitution.

And if the convenience of the state is to be preferred to the justice of its citizens, other exemptions will be required besides that of the executive. And I conclude that the plea of privilege cannot be maintained upon the evidence of public convenience, or public necessity. If, then, this exemption from arrest is not expressly directed by law in behalf of the executive, and if it cannot be implied from the urgent necessities of his office, to what feature in the office shall it be accorded? To its dignity? The king of England cannot, it

is true, be sued in the courts of his realm. Such an act is deemed inconsistent with his dignity and a violation of his prerogative. And the counsel for the respondent insists, that the executive power is as great under a democratic.form of government as under a monarchy. If by that he means to assert that the governor of this state wields powers as extensive as are exercised by the king of England, even the most liberal monarchy in Europe, I must think he has either misread the constitution, or I have failed to interpret correctly our own.

The law attribues to the king sovereignty; " *Rex est vicarius et minister Dei in terra,*" says Bracton. So much will not be asserted for the governor. The law ascribes to the king absolute perfection. It has never, to my knowledge, been claimed for the governor of Wisconsin. The king can suffer no laches, can never be a minor and can never die. He is omnipotent, always of full age, and is immortal. Of the king's royal prerogatives it is said he is not only the chief but the sole magistrate of the nation — all others acting by commission from and in due subordination to him. It is said he may reject what bills, may make what treaties, may coin what money, may create what peers, may pardon what officers, he pleases; unless where the constitution hath expressly or by evident consequence laid down some exception or boundary, declaring that "thus far the prerogative shall go, and no farther." 1 Black. Com., 187.

To the legislative power he holds these relations : Parliament cannot lawfully be convened without his writ, and is prorogued or dissolved at his command. His patent creates the numbers of one house, and he can add to their number according to his own pleasure. When convened, he himself constitutes a portion of the body. He appoints the speaker in one house, and approves the speaker in the other, and has an absolute veto upon all bills they may pass. The governor of Wisconsin holds no relations to its legislature, which bear even the similitude of these.

Over the judiciary he has less actual control. Still the

courts administer justice in his name.   In theory they are his
courts and for his assistance.   He commissions the judges, and
it was not until the reign of William and Mary that they ceased
to hold during the king's pleasure, and after that time until the
1 George III, so emphatically were they considered the agents
of the crown, that upon its demise their authority terminated.
The immediate predecessor of William III deliberately packed
a court for the purpose of obtaining a judgment, confirming his
claim to the dispensing power.   I am free to admit it would
be in bad taste for the king's courts to send out a writ, in the
king's name, to arrest the king's person.

Moreover, he is not only commander-in-chief of the army and
navy, but he calls out, augments or diminishes the military and
naval forces, and he makes war and peace.

Upon a deliberate view of these immense powers, I think we
shall be forced to admit that the queen of Great Britain is
clothed with higher powers than are vested in the governor of
Wisconsin.   And I think the counsel was mistaken in suppos-
ing that the grand distinction between our American executives
and the kings and monarchs of the old world is, that our exec-
utives are chosen by ourselves, and are made responsible to the
constitution, and to be tried by the tribunal which it has pro-
vided for official delinquency.   But on the contrary, I rather
think the grand distinction is, that our American executives
possess such powers as the sovereign people have been pleased
to give them, while the monarchs of the old world possess such
powers as revolution and civilization have not forced them to
resign.

It was said that recent events had demonstrated that demo-
cratic republican governments were the strongest in the world.
I joyfully admit the fact, and have faith to believe the world
will yet see further demonstrations of that great truth.   But I
venture to suggest, if it be quite safe, to estimate the strength
of republican government, by the quantum of power vested in
its executive arm.   Now, these two facts deserve our attention.

*First.* That the reason why Victoria could not be arrested to-day upon capias issued from the queen's bench, is not because her services are deemed so vitally necessary to the state, but it is confessedly because she is the *caput principium et finis* of the body politic. As such she is above all authority, because the courts have derived jurisdiction from the crown, and the crown has imposed no jurisdiction to which she can be subjected. It is because as sovereign she cannot be amenable to her own judicature, because the creator cannot be subject to the creature. According to which principle, I take it, the state of Wisconsin could not be sued in its own courts, had it not been so expressly provided by constitutional law. And *secondly.* No such consequences result to her subjects from this principle, as might result to the citizens of this state from conceding the same immunity to its governor, for it is the boast of the jurisprudence of that realm, that there is no right for which the law does not afford a remedy. Therefore, if any person have a just demand upon the queen in point of property, he may petition the chancellor and obtain justice. Not upon compulsion, indeed, any more than Falstaff rendered his reasons upon compulsion, but as a matter of grace. And for wrongs committed in cases of ordinary public oppression, she would make vicarious atonement in the person of her minister, who may be indicted or impeached for acts done in her name, and by her authority.

But in this state, on the contrary, if persons have not the same remedies against the governor that they have against private citizens in similar cases, I conceive they are without remedy; for we know none of those peculiar and extraordinary remedies which have been devised by the law of England. I should be reluctant, therefore, to adopt a conclusion which would place the citizen of Wisconsin further from the justice of its executive, than the British subject is from the justice of the queen.

But it was argued that the provision of certain remedies in

Vol. III. (Pin.) — 28

the constitution against the governor was the exclusion of all other remedies. The argument, I think, will lose much of its seeming force, if it be remembered that the same remedies provided by the constitution against the governor are provided against all other civil officers in the state, and in precisely the same language. Are there no other remedies against any other civil officer? Those remedies are applied only to instances of official corruption, crimes and misdemeanors. But if a civil officer violate a contract, commit a trespass, or withhold a right, does it necessarily involve either of those officers, or warrant the application of either of the remedies specified in the constitution? Certainly not; and yet I can conceive there must be a proper remedy, and as much in the case of the governor as any other civil officer.

But it was supposed that the execution of a judgment against the executive might be attended with some embarrassment. It was suggested that a coroner could serve process upon the sheriff, but there was no officer to serve process upon the governor; and it was demanded, with marked emphasis and significance, if service should be resisted, who would call out the militia, and who would command them? It is very possible these considerations might have some weight in determining whether it would be safe to assume jurisdiction of a cause to which the governor might be a party. But they would have very little, I apprehend, in determining whether it was proper to assume such jurisdiction. And, in fact, if such considerations are to be weighed in any case, I cannot say but it would be prudent for the court to ascertain the position of the militia, before proceeding to judgment in a cause to which the governor's brother or his cousin might be a party. Language similar to this has been employed before, though not that I remember in a court of law.

But when the duke of Somerset refused to escort the pope's nuncio to court in procession, because it would be a violation of the law, he was answered by James II, "I will teach you

to fear *me* as well as the *law.* Do you not know I am above the law?" "Your majesty may be above the law," replied the duke, "but I am not." Admonished by that sentiment of the noble duke, I will hope that whenever this court shall be called upon to determine the extent of its jurisdiction in a given case, it will reflect that, though if the jurisdiction be assumed, the militia may possibly interfere with its execution; yet, if they weakly or corruptly surrender a jurisdiction which the constitution and their oaths impose upon it, the militia will be hardly able to protect it against the penalty for such desertion. For myself, I was less affected by this portion of the argument than I might have been, but for a grave doubt which I entertain, not as to the spirit of the military corps, but as to the authority of the executive over it. I certainly do not deny but the governor is commander-in-chief of such military and naval forces as the state may call into its service; but that he has authority to call out these forces to resist a constable in serving the process of any of the courts existing under our constitution, is a position I could not concede without a fuller discussion of the military organization of the state than time will now permit. If he should call them out for that purpose, and they should come at his call, I should be inclined to regard it as an evidence of his good fortune rather than of his great power. That argument raises this simple question, whether, when the judicial power of the state shall have determined the extent of its jurisdiction in any given case, there remains to the executive authority to review such determination. No man can fail to perceive, that if such authority does exist, we have no independent judiciary; but, on the contrary, all its judgments derive their force, not from the authority of the court pronouncing them, but from the approval of the commander-in-chief of the militia; or, if it be said the authority exists, but is only to be exercised in cases where the governor is himself a party, it only makes the principle the more monstrous. It derives his power to review the decisions of the

judiciary, from the very circumstances which excluded all power to adjudicate from the judges, and all other officers and tribunals,— the circumstance of his having a direct personal interest in the cause. No judge or other officer has any jurisdiction to try any cause in which he has a personal interest; and it seems to me impossible that that which deprives all other tribunals of jurisdiction, should alone give jurisdiction to the governor. If a *ca. sa.* be issued against the executive officer, he has a personal interest in destroying its force, and it will hardly be claimed that such interest vests in him authority to deny its validity, and with force to resist its execution.

But if it be claimed that the courts can enforce against the governor those rights which the law exacts of him as a citizen, but not those which are exacted of him as governor, then, I say, the idea of the inviolability of his *person* is surrendered. Then the argument that he is commander-in-chief loses its force, for he is always that; then, if he be impleaded in the courts, he should withdraw the plea of privilege, and also his counsel should withdraw the militia and suffer the court to determine the question of jurisdiction upon the sole consideration of what is the right denied, and not, who is he that denies it. Then jurisdiction of his person would attach when he had received requisite notice of the suit, and the court would then have to determine, as I conceive, only whether it had jurisdiction of the subject matter.

I shall not discuss the question whether this court has jurisdiction of the subject matter of this petition. The court has not decided that question, and it is one which interests only the parties to it. Moreover, I cannot foresee but that the supreme court may be called upon at some future time judicially to determine it.

The other question is an abstract one, of constitutional law, which is involved in this case to be sure, but may be involved in hundreds of other cases. It affects the powers of the different departments of this government, and therefore is of

vital moment to the people of the whole state. As such, I have ventured upon this discussion of it. And it seemed to me the more proper that I should do so, because it happened to fall to my lot to award the rule upon the respondent in this case, and the argument (which has been published) seemed to me to assume a tone as if, in doing so, I had been wanting, not only in respect for the person, but also for the constitutional powers of the executive of this state.

I hope in this respect I misconceived the counsel. I trust, in my official conduct I have not been wanting in a due appreciation, either of the official dignity or private worth of that officer. And I did not feel to need the admonition of the counsel to be slow to encroach upon the constitutional prerogatives of any other branch of the government. I hope I am as incapable of trampling upon the constitutional powers of either the executive or legislative department of the state, as I am of any single right which the laws have vested in the humblest of its citizens, let who will gainsay that right. And whatever may be thought of the administration of the Jewish judges, it is consoling to reflect "that in those days there was no king in Israel." And it may be salutary to remember also, that the Jewish people did not reject their judges until they rejected their God. I Samuel, VII. ch., 7 v.

I therefore conclude that in a proper case the judicial power of the state may obtain jurisdiction over the person of its chief executive officer:

1. Because the jurisdiction of the courts over persons is coextensive with the state, and the governor is within the state.

2. Because in no case is such jurisdiction denied, while in criminal cases it is expressly given.

3. Because no necessity exists for conceding such an immunity to him, that does not exist in kind if not in degree, for granting the same to every other officer in the state.

4. Because such exemption cannot be conceded to the digni-

ty of his office without conceding that dignity is higher than law, instead of being derived from the law.

5. Because he enjoys no such supremacy in the body politic as will authorize the denial of such jurisdiction.

6. Because he possesses no such power as will prevent its exercise.

7. Because to concede such exemption might impose a hardship upon the body of the citizens from which the law affords no relief. And lastly,

Because since by the organic law the sovereign state is subjected to the liability of being sued, no inference can arise that either of its agents was ever intended to be exempt. And I think this conclusion is sustained by authority. In the case of *Madison v. Marbury*, before referred to, it was directly admitted by the counsel for the relator that the court could not issue a mandamus to the president in *any* case.

But the court, it seems to me, studiously avoided making any such admission. On the contrary, the court disclaims all power to control the president in the performance of those acts which the constitution leaves to his discretion, and says, while the heads of departments, who are appointed by the president to aid him in the discharge of his duties, act in the discharge of those duties, courts have as little right to control their action, and for the same reason to-wit: because the action is political and is left to executive discretion. But it is added, " when he is directed peremptorily to perform certain acts; when the rights of individuals are dependent upon the performance of those acts, he is so far the officer of the law ; is amenable to the laws for his conduct, and cannot at his discretion or caprice sport away the vested rights of others." *Marbury v. Madison*, 1 Cranch., 166.

It is a matter of history that president JEFFERSON felt a deep interest in that controversy ; that he strongly denied the jurisdiction of the court ; and that upon the question of jurisdic-

tion the issue was virtually between the president and the courts. But on the trial of Aaron Burr, a motion was made to issue a supœna, *duces tecum*, directly to the president himself.. The court (Chief Justice MARSHALL presiding) allowed the motion.

No one can read the opinion of the chief justice, and fail to perceive that he felt keenly the delicate nature of the issue presented, and we cannot fail also to perceive, that in the opinion of that great judge, the laws of this country had not idly vested in any of its citizens a right, and at the same time created an officer of rank so exalted as successfully to withhold that right. Burr's Trial, by Robinson, vol. 1, p. 177.

Upon the other question, as to what causes, to which the governor may be a party, the court may have jurisdiction of, I will say no more than to indicate the rule by which I conceive jurisdiction is to be determined in any given case, and it is this: If the law gives to an individual a right which is properly the subject of an action, and gives it absolutely, whether against him as governor, or as an individual, jurisdiction then attaches in the judicial power to determine and enforce that right. But if the right is contingent, and is made to depend upon the discretion of the executive, in such case, until that discretion be .exercised, no right can vest; and if, in the exercise of that discretion, the governor deny the right, then all claim of right is gone. His determination is final upon the question of right, as much as is that of a court of competent jurisdiction. To illustrate: by the constitution, the pardoning power is vested in the governor. If, therefore, A. demand a pardon of the executive, and it be refused — no matter how manifest may be the justice of his claim — no court can compel the governor to grant it. His right to it rests on the sound discretion of the executive, and his adjudication is final. But if the law making power should declare that A. was entitled to a patent for a certain piece of land, and should appoint the governor as the minister of the state to issue that patent; in such case, he has no

State ex rel. Resley and others vs. Farwell, Gov., etc.

discretion to exercise—only a plain duty to perform, and that not a political duty for the benefit of the state, but a ministerial one, to administer the acknowledged justice of the state to the individual. And I apprehend the governor may be compelled to deliver that patent, as he may be compelled to execute a deed for a piece of land upon his own contract to convey. Neither is required of him as the performance of an executive duty; but the law requires of him to perform the former act as its minister, and both as its subject. If, in such a case, there is any encroachment upon his official independence, it is on the part of the legislature, which charged him with a duty not required by the constitution. If such a law were without precedent, I conceive the executive might, with some plausibility, say to the legislature: "I do not acknowledge your right to command me to the performance of any duty, and I refuse to obey." But there can be no usurpation on the part of a court which simply seeks to vindicate a law which has been declared by competent authority.

HUBBELL, J., *dissenting*. I do not fully concur in the foregoing opinion, as drawn up by my brother HOWE. Although the court determined, and rightly, as I think, that it had no original jurisdiction in this case, and must dismiss the proceedings for that cause, yet, as we did consent to express an unofficial opinion upon one or two points, for the information of the respondent, I wish to state distinctly and without argument, what I understand to be the grounds of that opinion.

And *first*, we were asked to state whether there was any valid, legal objection to the issuing by the respondent of the certificates authorized by the act of April, 1852 (Laws 1852, ch. 340), and we unanimously, as I understood it, determined that there was not, in cases where work had been certified by the proper officer to have been done under contracts made in conformity to existing laws.

*Second.* We determined, with the same unanimity, that the

respondent was not required by any law to give the certificate, contracted by Governor DEWEY to be furnished to *Morgan L. Martin*, authenticating the scrip issued to him. This is the length and breadth of the opinion we gave. By consent, all constitutional questions were waived, or, at least, were held not to have been so raised in the case, as to require an opinion.

We were aware that a question might arise, under the contract of the relator (as well as under that of *Morgan L. Martin*, brought before us at the same term with the present), involving a construction of section 10, article 8, of the constitution, but no opinion whatever was intended to be expressed upon that section. That section is as follows: "The state shall never contract any debts for works of internal improvement, or be a party in carrying on such works; but whenever grants of land or other property shall have been made to the state, especially dedicated by the grant to particular works of internal improvement, the state may carry on such particular works, and shall devote thereto the avails of such grants, and may, pledge or appropriate the revenues derived from such works in aid of their completion."

This is an important and peculiar provision, involving rights and interests of immense magnitude; and it will be time enough to settle its construction, when a question shall be so raised before the proper tribunal as to render such construction authoritative. But I desire to state more definitely what I understand we did not do. What I understand is this, that we did not design to express or intimate an opinion, whether the state is authorized by the constitution to carry on the Fox river improvement, and much less, whether it is authorized to do so in the manner provided by existing laws, and the contracts made under them. The question was indeed discussed, whether a state debt was or would be created by the prosecution of the work connected with this improvement. But inasmuch as we were satisfied that if the state was made liable at all, such liability must arise from the passage of the acts authorizing and

State ex rel. Resley and others vs. Farwell, Gov., etc.

directing the work to be done, and from the actual doing of the work by individuals under the directions of state officers, and their certifying it done, we came naturally to the conclusion that no state indebtedness would be created by the issuing of certificates which deferred payment of the principal for a period of ten years, and provided that both principal and interest should be paid out of the proceeds of the land granted by congress to the work.

Without assuming to determine whether my brother HOWE has intended to express any other or different views upon these points, I have deemed it proper, in so important a matter, to place my own views explicitly upon the record.

Mandamus denied.